UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ───────────────────────── )<br>**ANNA JACQUES HOSPITAL,** )<br><u>et</u> <u>al.</u>, )<br> )<br>          **Plaintiffs,** )<br> )<br>     v.                    )<br> )<br>**MICHAEL O. LEAVITT,** )<br>**in his official capacity as** )<br>**Secretary of the United** )<br>**States Department of Health** )<br>**and Human Services,** )<br> )<br>          **Defendant.** )<br>───────────────────────── ) | **Civil Action No. 05-625 (GK)** |

## MEMORANDUM OPINION

Plaintiffs, sixty-two Massachusetts hospitals, bring this action against Michael O. Leavitt in his official capacity as Secretary of Health and Human Services. They challenge a change in the method the Secretary employs in calculating the area wage cost index used for reimbursing hospitals under Medicare. This matter is before the Court on Plaintiff's Motion for Summary Judgment [**Dkt. No. 17**] and Defendant's Cross Motion for Summary Judgment [**Dkt. No. 19**]. Upon consideration of the Motions, Oppositions, Replies, Surreply, the parties' arguments at the Motions Hearing held on February 6, 2008, and the entire record herein, and for the reasons stated below, Plaintiff's Motion for Summary Judgment is **granted** and Defendant's Motion for Summary Judgment is **denied.**

**I.    BACKGROUND**[1]

**A.    Medicare's Reimbursement Scheme**

Reimbursement under Medicare is governed by "[a] complex statutory and regulatory regime." Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 404 (1993).  Most hospitals are reimbursed under the Prospective Payment System ("PPS").  See 42 U.S.C. § 1395ww(d). Hospitals reimbursed under the PPS are commonly referred to as "subsection (d) hospitals."

Under the PPS, hospitals are reimbursed a specific amount based on a patient's diagnosis (referred to as a diagnosis-related group or "DRG") regardless of the actual costs to treat the patient.  Id.  The Secretary sets fixed national rates for reimbursement of specific DRGs.  Id. These rates are then adjusted for various factors, including the prevailing wage rate in the hospital's geographic area.  Id.

To adjust for regional wage variations, the Secretary creates a wage index by performing a "survey...of the wages and wage-related costs of subsection (d) hospitals" on an annual basis.  42 U.S.C. § 1395ww(d)(3)(E)(i).[2]  The resulting wage index allows for

---

[1] Unless otherwise noted, the facts set forth herein are undisputed and drawn from the parties' summary judgment papers.

[2] The Section states in full that:

> ...the Secretary shall adjust the proportion, (as estimated by the Secretary from time to time) of hospitals' costs which are attributable to wages
> (continued...)

comparison between national wage levels and prevailing wage levels in specific geographic regions.  Numerically expressed, regions with an area wage index of less than 1.0 are areas where wage levels are beneath the national average.  Conversely, areas with an area wage index over 1.0 have wage levels that are above the national average.  Because of the delay in obtaining and analyzing this data, the wage index that applies for a given year is the result of data obtained from hospitals three years earlier.  Compl. & Answer ¶ 14.

The specific geographic regions employed in this process are based on criteria provided by the Office of Management and Budget. 42 C.F.R. § 412.64.  A particular state may have multiple urban areas, each containing one or more hospitals.  All hospitals located in rural areas in a state are grouped into a single rural area.  Id.

---

[2](...continued)
and wage-related costs, of the DRG prospective payment rates computed under subparagraph (D) for area differences in hospital wage levels by a factor (established by the Secretary) reflecting the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level.  Not later than October 1, 1990, and October 1, 1993 (and at least every 12 months thereafter), the Secretary shall update the factor under the preceding sentence on the basis of a survey conducted by the Secretary (and updated as appropriate) of the wages and wage-related costs of subsection (d) hospitals in the United States....

42 U.S.C. § 1395ww(d)(3)(E)(i).

The wage index applicable to a particular hospital is based on data from the geographic area within which the hospital is found. 42 U.S.C. § 1395ww(d)(3)(E)(i).  However, there is an exception to this rule.  An urban area's wage index may not fall lower than the rural wage index established for that state.  Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4410, 111 Stat. 251, 402 (1997).

Although most hospitals are reimbursed under the PPS, critical access hospitals ("CAHs") are not.  CAHs are of limited size, provide acute care to their patients, and are generally located in rural areas.  42 U.S.C. § 1395i-4(c)(2)(B).  Instead of receiving payments under the PPS, CAHs receive 101% of their actual reasonable costs.  42 U.S.C. § 1395m(g)(1).  Subsection (d) hospitals may elect to become CAHs if they meet the appropriate statutory requirements.  42 U.S.C. § 1395i-4(e).

**B.  The Secretary's Decision to Exclude Data from Subsection (d) Hospitals that Later Became CAHs from the Wage Index for Fiscal Year 2004**

CAHs were first created in 1997 as an overlay to the existing Medicare reimbursement scheme.  From 1997 to 2003, the Secretary included in his periodic wage surveys wage data from hospitals that had become CAHs.  See Proposed Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2004 Rates, 68 Fed. Reg. 27,154, 27,190 (proposed May 19, 2003).

The Secretary changed this approach for Fiscal Year 2004.  In a notice of proposed rulemaking issued on May 19, 2003, the

4

Secretary requested comment regarding whether wage data from subsection (d) hospitals that were later redesignated as CAHs should be excluded from the wage index calculation.  Id.  This request for comment was a result of "correspondence [received by the Secretary] suggesting that the wage data for hospitals that have subsequently been redesignated as CAHs should be removed from the wage index calculation because CAHs are unique compared to other short-term, acute care hospitals."  Id.

Commenters generally supported removing data from hospitals that had become CAHs after the survey year from the wage index, although several were critical of the proposal.  Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2004 Rates, 68 Fed. Reg. 45,346, 45,397 (Aug. 1, 2003).  The Secretary chose to exclude CAH data from the wage calculation and offered the following rationale:

> CAHs represent a substantial number of hospitals with significantly different labor costs in many labor market areas where they exist.  Using data collected for the proposed FY 2004 wage index, we found that, in 89 percent of all labor market areas with hospitals that converted to CAH status some time after FY 2000, the average hourly wage for CAHs is lower than the average hourly wage for other short-term hospitals in the area.  In 79 percent of the labor market areas with CAHs, the average hourly wage for CAHs is lower than the average hourly wage for other short-term hospitals by 5 percent or greater.  These results suggest that the wage data for CAHs, in general, are significantly different from other short-term hospitals.

Id.

The Secretary also analyzed the potential redistributive effect of removing CAH data from the wage index and made the following findings:

> Further, we found that removing CAHs from the wage index would have a minimal redistributive effect on Medicare payments to hospitals.  The majority of the labor market areas would decrease by only 0.30 percent in their wage index value....Only 10 areas would experience a decrease in their wage index values greater than 0.30 percent. The greatest negative impact is 9.57 percent. Meanwhile, positive impacts occur in 48 areas, 30 of which are in rural areas.  Overall, removing CAHs from the wage index would have a minimal redistributive effect on Medicare payments to hospitals.

Id.

Based on these findings, the Secretary concluded that "removing CAHs from the wage index is prudent policy, given the substantial negative impact these hospitals have on the wage indexes in the areas where they are located and the minimal impact they have on the wage indexes of other areas."  Id.

> Therefore, beginning with the FY 2004 wage index, we are excluding from the wage index the wages and hours for all hospitals that are currently designated as a CAH, even if the hospital was paid under the IPPS during the cost reporting period used in calculating the wage index.  We believe that this change improves the overall equity of the wage index.

Id. at 45,398.

However, this change applied only to subsection (d) hospitals that later converted to CAH status, and not to hospitals that converted to other provider types or to institutions that had subsequently closed.

> We note that we would continue to include the wage data for other terminating or converting hospitals for the period preceding their change in Medicare provider status, as long as those data do not fail any of our edits for reasonableness. This is because we continue to believe that the wage data for these hospitals, unlike CAHs, are not necessarily unique compared to other short-term hospitals, and these terminating or converting hospitals provide an accurate reflection of the labor market area during the relevant past period.

Id. at 45,397-98.

This change was first implemented for the wage index for Fiscal Year 2004, which is not challenged by Plaintiffs. Instead, they challenge the calculation of the Fiscal Year 2005 index, which was based on survey data from 2001.

### C. The Impact on Plaintiffs of Removing CAH Data from the 2001 Wage Survey for the Fiscal Year 2005 Index

Massachusetts was one state that did show a substantial decrease in its wage index as a result of the Secretary's change in calculating the wage index. Nantucket Cottage Hospital was the only subsection (d) hospital located in a rural area in Massachusetts in 2001--the survey year used in determining the Fiscal Year 2005 wage index. In 2002, the very next year, Nantucket Cottage Hospital converted to CAH status. As the only hospital in a rural area in Massachusetts, Nantucket Cottage Hospital would therefore have set the wage index floor for hospitals throughout the state at 1.2919 under the Secretary's previous policy. See Balanced Budget Act of 1997, § 4410, 111 Stat. at 402.

However, under the Secretary's new policy, the wage data for Nantucket Cottage Hospital was removed from the final wage index calculated for Massachusetts.   Because of this change, Massachusetts no longer had any subsection (d) hospitals in rural areas.   Instead, the Secretary chose to impute a rural wage index for Massachusetts, as he did for several other states which were also considered entirely urban.

As a result, the Secretary imputed a lower rural wage floor for Massachusetts of 1.0438, which then served as the wage index floor for all hospitals in the state.   Plaintiffs argue that they were deprived of approximately $200 million in Medicare reimbursements as a result of this change.

Plaintiffs filed a group appeal of the Secretary's decision with the Provider Reimbursement Review Board ("PRRB").   The PRRB found that it lacked authority to decide the legal validity of the Secretary's determination and granted Plaintiff's request for expedited judicial review.   Plaintiffs then filed suit against the Secretary in this Court.

## II.   STANDARD OF REVIEW

Summary judgment may be granted "only if" the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.   See Fed. R. Civ. P. 56(c), as amended December 1, 2007; Arrington v. United

States, 473 F.3d 329, 333 (D.C. Cir. 2006).  In other words, the moving party must satisfy two requirements: first, demonstrate that there is no "genuine" factual dispute and, second, that if there is it is "material" to the case.  "A dispute over a material fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"  Arrington, (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A fact is "material" if it might affect the outcome of the case under the substantive governing law.  Liberty Lobby, 477 U.S. at 248.

In its most recent discussion of summary judgment, in Scott v. Harris, __ U.S. __, 127 S. Ct. 1769, 1776 (2007), the Supreme Court said,

> [a]s we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 . . . (1986) (footnote omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Liberty Lobby, 477 U.S. at 247-48.

However, the Supreme Court has also consistently emphasized that "at the summary judgment stage, the judge's function is not...to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial."  Liberty Lobby, 477 U.S. at 248, 249.  In both Liberty Lobby and

<u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 150 (2000), the Supreme Court cautioned that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts, are jury functions, not those of a judge" deciding a motion for summary judgment. <u>Liberty Lobby</u>, 477 U.S. at 255.  In assessing a motion for summary judgment and reviewing the evidence the parties claim they will present, "the Court must draw all reasonable inferences in favor of the non-moving party." <u>Reeves</u>, 530 U.S. at 150.  "To survive a motion for summary judgment, the party bearing the burden of proof at trial...must provide evidence showing that there is a triable issue as to an element essential to that party's claim. <u>See Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986)." <u>Arrington</u>, 473 F.3d at 335.[3]

## III. ANALYSIS

Plaintiffs argue that the Secretary's actions were unlawful for two reasons.  First, they contend that the Secretary exceeded his statutory authority and his actions must be set aside pursuant to 5 U.S.C. § 706(2)(C) and under the two-step analysis set out in <u>Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837 (1984).  Second, they argue that the Secretary's

---

[3] It should be noted that a non-movant's affidavit may suffice to defeat a summary judgment motion if the parties' sworn statements are materially different. <u>Greene v. Dalton</u>, 164 F.3d 671, 674-75 (D.C. Cir. 1999); <u>Arrington</u>, 473 F.3d at 337.

actions were arbitrary and capricious and must be set aside under 5 U.S.C. § 706(2)(A).  Each argument is addressed in turn.

### A.    The Secretary Exceeded His Statutory Authority

#### 1.    The Chevron Standard

To determine if the Secretary exceeded his statutory authority in violation of 5 U.S.C. § 706(2)(C), the Court must engage in the two-step inquiry required by Chevron.

First, the Court must determine "whether Congress has directly spoken to the precise question at issue."  467 U.S. at 842.  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  Id. at 842-43.  When addressing Chevron's step one, a court should employ the traditional tools of statutory interpretation, including "'examination of the statute's text, legislative history, and structure[,] as well as its purpose."  Shays v. FEC, 414 F.3d 76, 105 (D.C. Cir. 2005) (quoting Bell Atl. Tel. Cos. v. FCC, 131 F.3d 1044, 1047 (D.C. Cir. 1997)).

However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's [interpretation] is based on a permissible construction of the statute."  Chevron, 467 U.S. at 843.  Under this second step of the Chevron analysis, if Congress has implicitly delegated authority to the agency to fill gaps in the statutory framework

through appropriate regulation, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation" made by the agency.  <u>Id.</u> at 844.

> **2.    Congress Has Spoken Directly to the Question at Issue.**

The starting point in determining if Congress has directly spoken to the issue under <u>Chevron</u> step one is to first consider the plain meaning of the statutory text itself.  <u>S. Calif. Edison Co. v. FERC</u>, 195 F.3d 17, 23 (D.C. Cir. 1999).

The applicable statutory provision, 42 U.S.C. § 1395ww(d)(3)(E)(i), requires the Secretary to "adjust the proportion...of hospitals' costs which are attributable to wages and wage related costs...by a factor (established by the Secretary) reflecting the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level."  The statute requires that the "factor" shall be updated "on the basis of a <u>survey</u> conducted by the Secretary (and updated as appropriate) of the wages and wage-related costs of subsection (d) hospitals in the United States."  <u>Id.</u> (emphasis added).

The plain meaning of the word "survey," as used in this context, is "a systematic collection and analysis of data and esp[ecially] statistical data on some aspect of an area or group." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (UNABRIDGED) 2302 (3d Ed. 1993). One critical aspect of any survey is that it is directed at a specific universe of data viewed in a specific window of time.

12

This "target population consists of all elements (i.e. objects, individuals, or other social units) whose characteristics or perceptions the survey is intended to represent." Shari Seidman Diamond, Reference Guide on Survey Research, in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 229, 239 (2d Ed. 2000). "Identification of a survey population must be followed by selection of a sample that accurately represents that population." Id. at 242. Here, Congress has clearly set out the target population for the survey, namely, "the wages and wage-related costs of subsection (d) hospitals in the United States." 42 U.S.C. § 1395ww(d)(3)(E)(i).

Moreover, Congress' use of the term "survey" must be read in light of the first sentence of 42 U.S.C. § 1395ww(d)(3)(E)(i), which requires that the area wage index accurately "reflect[] the relative hospital wage level in the geographic area of the hospital" when compared to the national average. See FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132 (2000) ("In determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation. The meaning--or ambiguity--of certain words or phrases may only become evident when placed in context."). Thus, not only did Congress require a survey of wage-related costs of subsection (d) hospitals, it required that this survey faithfully reflect the actual wage

costs of those hospitals in different geographic regions at the time of the survey.[4]

The statute also requires that the Secretary "shall" update the wage index "on the basis of" this survey.  42 U.S.C. § 1395ww(d)(3)(E)(i).  The term "shall" has generally been construed as mandatory language that does not permit the exercise of discretion.  See, e.g., Nat'l Ass'n of Home Builders v. Defenders of Wildlife, ___ U.S. ___, 127 S. Ct. 2518, 2531-32 (2007) (statutory language that the EPA "shall approve" an application if nine statutory factors are present does not permit agency discretion to consider other factors).

The Secretary relies on the statute's provision that he update the wage index "on the basis of" the wage survey, to argue that the plain meaning of this term gives him sweeping discretion to exclude the wage data of certain subsection (d) hospitals when calculating the wage index.  This argument proves too much.  Under his reading of the statute, there would be no discernible limits to the Secretary's discretion to exclude wage data.[5]

The term "on the basis of" does not have the plain meaning that the Secretary would ascribe to it.  "Basis" is defined as the

---

[4] The Secretary conceded in oral argument that the statute requires that the wage index accurately reflect prevailing wage conditions in different geographic regions.

[5] As discussed below, see pp. 15-18, the legislative history demonstrates that Congress intended to sharply curtail, not expand, the Secretary's discretion when it enacted the 1987 Amendment.

"basic principle" or "the principal component of something." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 95 (10th Ed. 1996). Although the plain meaning of the term "on the basis of" does not require that the area wage index slavishly adhere to the results of the wage survey,[6] the results of the survey must be the principal component in updating a wage index that accurately reflects those results.

Thus, the plain language of the statute indicates that Congress required the Secretary to conduct an accurate survey of the wages and wage-related costs of subsection (d) hospitals and to use the resulting data as the "principal component" or "basic principle" in adjusting the area wage index. The statute does not give the Secretary discretion to exclude from the survey an entire category of institutions that were subsection (d) hospitals at the time of the survey, nor to choose to exclude those same hospitals when updating the area wage index on the basis of the survey because the Secretary felt those hospitals have "substantially different labor costs in many labor market areas where they exist." 68 Fed. Reg. at 45,397.

An examination of the legislative history of Congressional amendments to the statute reinforces this understanding of its plain meaning. Prior to 1987, Congress had not specified the appropriate mechanism to be used by the Secretary in adjusting the

---

[6] For example, no one challenges the right of the Secretary to exclude demonstrably erroneous data.

wage index.  See Social Security Amendments of 1983, Pub. L. No. 98-21, § 601, 97 Stat. 65, 156.[7]  Our Court of Appeals held that this earlier version of the statute did "not specify how the Secretary should construct the index, nor how often she must revise it."  Methodist Hosp. v. Shalala, 38 F.3d 1225, 1229 (D.C. Cir. 1994).  Consequently, the Court ruled that "Congress through its silence delegated these decisions to the Secretary."  Id.[8]

In 1987, Congress ended its silence and sharply limited the Secretary's discretion by amending the statute to include the following provision:

> Not later than October 1, 1990 (and at least every 36 months thereafter), the Secretary shall update the factor under the preceding sentence on the basis of a survey conducted by the Secretary (and updated as appropriate) of the wages and wage-related costs of subsection (d) hospitals in the United States.

---

[7] This version of 42 U.S.C. § 1395ww(d)(3)(E) enacted in 1983 provides:

> The Secretary shall adjust the proportion, (as estimated by the Secretary from time to time) of hospitals' costs which are attributable to wages and wage-related costs, of the national and regional DRG prospective payment rates computed under subparagraph (G) for area differences in hospital wage levels by a factor (established by the Secretary) reflecting the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level.

Social Security Amendments of 1983, Pub. L. No. 98-21, § 601, 97 Stat. 65, 156.

[8] Because Methodist Hospital dealt with the statute prior to its 1987 amendment, it does not control this case.

16

Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203, §
4004, 101 Stat. 1330.[9]   The Conference Report concerning the
legislation recognized, as Methodist Hospital later held, that the
law existing prior to the amendment specified "[n]o particular
methodology for developing the indices."   H.R. CONF. REP. NO. 100-
495, at 519-21 (1987), as reprinted in 1987 U.S.C.C.A.N. 2313-1245,
2313-1265 to 2313-1267.   The Report described the Senate version of
the bill(which was later adopted by the Conference Committee and
then enacted into law) concerning the new wage index survey as
follows:

> The indices are to be based on a survey, updated as
> appropriate of wages and wage-related costs for PPS
> hospital [sic].   To the extent the Secretary deems
> feasible, the survey is to measure earnings and paid
> hours of employment by occupational category and exclude
> data on wages and wage-related costs incurred in
> furnishing skilled nursing facility services.

H.R. CONF. REP. NO. 100-495, at 524 (1987), as reprinted in 1987
U.S.C.C.A.N. 2313-1245, 2313-1270.   This legislative history lends
additional support for the conclusion that Congress intended to
curtail the Secretary's previously existing discretion and mandate
the particular mechanism by which the Secretary would adjust the

---

[9] In 1989, Congress amended the statute once more to require
the Secretary to update the wage index every twelve months instead
of thirty-six.   Omnibus Budget Reconciliation Act of 1989, Pub. L.
No. 101-239, § 6003, 103 Stat. 2106.   This further demonstrates
that Congress intended the wage index to reflect, as accurately as
possible, the most recent wage survey data available.

area wage index--through a survey of wage-related costs of subsection (d) hospitals.

Additional language in the 1987 amendment demonstrates that Congress _did_ explicitly grant the Secretary discretion concerning certain other issues.  For example, the 1987 amendment provided that "[t]o the extent determined feasible by the Secretary," wage costs could be measured by occupational category.  Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203, § 4004, 101 Stat. 1330.  Thus, Congress knew how to grant discretion to the Secretary when it chose to do so.  "[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." United States v. Villanueva-Sotelo, ___ F.3d ___, 2008 WL 398446, at *13 (D.C. Cir. Feb. 15, 2008) (quoting Barnhart v. Sigmon Coal Co., 534 U.S. 438, 452 (2002)) (emphasis and internal quotation marks omitted).  No such discretion-granting language was included in the operative portions of the statute at issue in this case.

The Second Circuit's decision in Bellevue Hosp. Ctr. v. Leavitt, 443 F.3d 163 (2d Cir. 2006), although involving different facts, highlights the Secretary's lack of discretion under the statute in calculating the area wage index:

> [The Secretary's] task is unambiguous: to calculate a
> factor that reflects geographic-area wage-level

> differences, and nothing else.  We reject defendant's contention that this provision, or any other in the Medicare Act, confers upon him the discretion to take into account all sorts of unrelated policy considerations, such as whether certain hospitals receive unwarranted advantages from other provisions of the Medicare reimbursement scheme.

Id. at 174-75.

Thus, the plain language of the statute, its legislative history, and subsequent judicial treatment all indicate that the Secretary's pre-existing statutory discretion was sharply curtailed and that he was mandated to perform an accurate wage survey of all subsection (d) hospitals and to periodically update the wage index on the basis of that survey, so that the wage index would accurately reflect relative hospital wage levels in different geographic areas in a particular time period.

   **3.   The Secretary Did Exceed His Authority Under the Statute by Excluding Subsection (d) Hospitals that Later Converted to CAH Status when Calculating the Area Wage Index**

The Secretary violated Congress' clear command that he conduct an accurate survey of wages at subsection (d) hospitals and then update the area wage index on the basis of that survey.  He exceeded his authority by cherry-picking[10] data from hospitals that had been subsection (d) hospitals in the survey year, but had later converted to CAH status after the survey period.  The Secretary did

---

[10] For example, he did not exclude data from hospitals that were subsection (d) hospitals in the survey year, but later converted to other provider types or that closed.

so because he found wage data for CAHs to be "significantly different from other short-term hospitals."  68 Fed. Reg. at 45,397.

Congress, however, did not provide the Secretary with discretion to remove data from a group of institutions that were subsection (d) hospitals at the time of the survey because the Secretary found this wage data to not be representative of the wage costs of subsection (d) hospitals as a whole.  Instead, Congress required a survey of the _actual_ wage costs of subsection (d) hospitals so that the survey would accurately "reflect[] the relative hospital wage level in the geographic area of the hospital," 42 U.S.C. § 1395ww(d)(3)(E)(i), when compared to the national average.  Congress mandated that this survey of all subsection (d) hospitals would then form the basis for updating the area wage index.  As the Second Circuit noted in Bellevue Hosp., the Secretary's task is "unambiguous: to calculate a factor that reflects geographic-area wage-level differences, and nothing else." 443 F.3d at 174.  The Secretary did not do what Congress ordered and instead constructed an area wage index that did not accurately reflect, and in fact distorted, regional wage variations among subsection (d) hospitals.  Therefore, he exceeded the authority provided to him by Congress.  For that reason, the Secretary's actions must be set aside under 5 U.S.C. § 706(2)(C).

Because the Court therefore concludes that Congress has spoken directly to the question at issue under <u>Chevron</u> step one and that the Secretary has exceeded his statutory authority, the Court need not turn to <u>Chevron</u> step two.

**B.   The Secretary's Actions Were Arbitrary and Capricious**

Even though the Court finds that the Secretary exceeded his statutory authority, in the interests of judicial economy, the Court will also address Plaintiffs' argument that the Secretary's actions were arbitrary and capricious and should be set aside pursuant to 5 U.S.C. § 706(2)(A).

**1.   The Arbitrary and Capricious Standard**

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983). An agency may only consider relevant data and must articulate an explanation for its actions. <u>Id.</u>

> Normally, an agency rule would be arbitrary and capricious if [1] the agency has relied on factors which Congress had not intended it to consider, [2] entirely failed to consider an appropriate aspect of the problem, [3] offered an explanation for its decision that runs counter to the evidence before the agency, or [4] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

<u>Id.</u> An agency action is subject to heightened scrutiny when it reflects a change in a long-standing policy of the agency. <u>Mich. Pub. Power Agency v. FERC</u>, 405 F.3d 8, 12 (D.C. Cir. 2005).

Although there is some overlap between <u>Chevron</u> step two analysis and review of agency actions to determine if they are arbitrary and capricious, <u>see</u> <u>Shays</u>, 414 F.3d at 96-97, the inquiry under <u>Chevron</u> step two is "directed primarily at the decision of the agency," whereas challenges under the arbitrary and capricious standard "focus mainly on the decision-making process and rationale behind agency action." <u>Individual Reference Servs. Group, Inc. v. FTC</u>, 145 F. Supp. 2d 6, 25 (D.D.C. 2001). Nevertheless, both standards require the Court to determine if the agency "has rationally considered the factors deemed relevant by the Act." <u>Gen. Am. Transp. Corp. v. ICC</u>, 872 F.2d 1048, 1053 (D.C. Cir. 1989).

### 2. The Secretary Considered Factors that Congress Had Not Intended Him to Consider

The Secretary improperly considered two factors that Congress did not intend him to consider.

First, the Secretary excluded wage data of hospitals that had converted to CAH status because he considered that data to be "significantly different from other short-term hospitals." 68 Fed. Reg. at 45,397. However, as discussed above, the statute requires that the wage index be calculated on the basis of wage data for all subsection (d) hospitals, and not be based on the Secretary's individualized selection of what data is or is not worthy of consideration. Thus, whether wage data from hospitals that had converted to CAH status after the survey year was "significantly different" was irrelevant to the Secretary's task. The basic

purpose of a "survey" is, as Plaintiffs argue, to present a "snapshot" of all the variations within a defined set of data at a given point in time--in this case, all subsection (d) hospitals in the survey year.

Moreover, the Secretary offered no explanation as to why the "significantly different" wage costs of hospitals that had later converted to CAH status was relevant to his decision.  It is not surprising that there will be some variability of results when surveying a particular universe of data.  The Secretary never adequately explained why some survey results should be factored into the area wage index because they were deemed to accurately reflect costs in the labor market, see 68 Fed. Reg. at 45,398, while other results are "unique" and do not accurately reflect costs, id., especially in light of the Congressional mandate that the wage index accurately reflect regional wage variation among all subsection (d) hospitals.  Nor did the Secretary adequately explain why he departed from his previous policy of including wage data from subsection (d) hospitals that later converted to CAH status after the survey year.  See Mich. Pub. Power Agency, 405 F.3d at 12.

Second, the Secretary impermissibly based his decision on the finding that "removing CAHs from the wage index would have a minimal redistributive effect on Medicare payments to hospitals." 68 Fed. Reg. at 45,397.  Again, the statute provides no basis for

the Secretary to consider the impact of redistributing Medicare reimbursements from one geographic region to another.  Nor has the Secretary provided an adequate explanation for why he even considered the redistributive impact of the policy change.  By considering this factor, the Secretary failed to fulfill the statutory purpose of the wage index: to accurately "reflect[] the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level."  42 U.S.C. § 1395ww(d)(3)(E)(i).[11]

Because the Secretary considered irrelevant factors that Congress did not intend him to consider, and consideration of those factors conflicts with Congress' goal to obtain a wage index that accurately compares the relative hospital wage level in a particular geographic area with the national average hospital wage level, the Secretary's actions are arbitrary and capricious and must be set aside pursuant to 5 U.S.C. § 706(2)(A).

---

[11] In his Motion and Reply, the Secretary asserts that he excluded subsection (d) hospitals that later converted to CAH status because these hospitals were not subsection (d) hospitals at the time the Fiscal Year 2005 wage index was calculated and that the survey results were updated to reflect this change.  The Secretary never included this argument as a rationale for his action during the notice and comment rulemaking process.  See 68 Fed. Reg. at 45,397-98.  It is axiomatic that a court "may uphold agency orders based only on reasoning that is fairly stated by the agency in the order under review" and that "post hoc rationalizations by agency counsel will not suffice."  Fla. Mun. Power Agency v. FERC, 411 F.3d 287, 291 (D.C. Cir. 2005) (internal quotation marks and citations omitted).

**IV.   CONCLUSION**

For the reasons set forth above, the Court finds that the Secretary's actions were unlawful and must be set aside because they were in excess of statutory authority and arbitrary and capricious.   Therefore, Plaintiff's Motion for Summary Judgment [**Dkt. No. 17**] is **granted** and Defendant's Motion for Summary Judgment [**Dkt. No. 19**] is **denied.**   An Order shall accompany this Memorandum Opinion.


February 26, 2008

__/s/_____
Gladys Kessler
United States District Judge

**Copies to: Attorneys of record via ECF**